**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GUN OWNERS OF AMERICA, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-2919 (ABJ) |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION FOR PROTECTIVE ORDER**

**BACKGROUND AND STATEMENT**

This case involves a Freedom of Information Act ("FOIA") Request made by Gun Owners of America, Inc. and Gun Owners Foundation ("Plaintiffs") to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or "Defendant") on April 28, 2021.  ECF #1-1.  In it, Plaintiffs sought records related to a secret surveillance program administered by the Federal Bureau of Investigation ("FBI") and used by federal and state law enforcement agencies, including ATF, to monitor and record the firearm purchases of American citizens who are eligible to purchase and possess firearms.  When ATF failed to respond for well over a year,[1] Plaintiffs filed suit on July 5, 2022.  Over the ensuing months, ATF made a series of 12 productions of records to Plaintiffs, showing in detail how the National Instant Criminal Background Check System ("NICS") Monitoring Program has been used to surveil – without a warrant, and often without any

---

[1] On the same date, Plaintiffs submitted an identical request to the FBI (FOIPA Request No.: 1495550-000).  The FBI, unlike ATF, promptly processed and released responsive records, including spreadsheets demonstrating that the FBI and ATF were *actively* monitoring more than a thousand persons.  *See* https://tinyurl.com/ymr7wprx; https://tinyurl.com/4mm72svw.

particularized suspicion at all – an untold number of Americans whose firearm transactions *are approved* by the FBI and thus are found *eligible* to purchase and possess firearms.

ATF and FBI justify this monitoring program not based on any authority found in federal law.  In fact, federal law expressly denies the federal government the authority to keep records of guns or gun owners, and requires the FBI to destroy information about approved gun transfers (the "NICS Audit Log") within 24 hours.  Rather, Defendant relies entirely on an FBI regulation adopted in 2004 which purports to permit the FBI, within that 24-hour window, to copy, extract, and share information from the NICS Audit Log "with appropriate authorities responsible for investigating, prosecuting, and/or enforcing such law or regulation."  Not only is the FBI's regulation at odds with the statute (and Congressional intent in requiring destruction of NICS records on gun owners), but also the FBI does not administer the NICS Monitoring Program in compliance even with its own defective regulation.  Further, the warrantless surveillance of gun owners – monitoring in real time how Americans exercise their constitutional rights – violates the Second and Fourth Amendments.  Because of these numerous illegalities inherent in this secret government surveillance program, the redacted documents previously released by ATF have resulted in broad media coverage, attention from state legislators, and significant attention from Members of Congress.

On September 6, 2023, Defendant ATF made a thirteenth production to Plaintiffs, which is the subject of these proceedings.  That ATF production contained FOIA redactions that were indicated, but not actually made.  After Plaintiffs' counsel notified counsel for Defendant of this fact, and asked for a redacted version to be shared with the press, ATF and its counsel responded with an increasingly aggressive series of demands that Plaintiffs' counsel immediately destroy all copies of the unredacted production and provide written confirmation of having done so.  Although

Plaintiffs' counsel explained there was no urgency, representing that no dissemination of the records would take place until the matter could be resolved in court, ATF hurriedly filed a motion seeking an unnecessary protective order.  ECF #20 ("MPO" or "Motion").  On September 18, 2023, this Court entered a minute order granting Plaintiffs additional time to respond, but largely granting (in an interim form) the relief sought by Defendant, ordering that, "pending resolution of the motion for protective order, plaintiff must sequester the FOIA records that were inadvertently produced on September 6, 2023, and that it shall not disseminate, disclose, or use those records or their contents for any purpose pending the Court's ruling on the Motion for Protective Order."

Thereafter, Plaintiffs filed a Motion to Clarify (ECF #25), seeking guidance as to whether the Court's minute order's barring any "use" of the documents should be understood to prohibit counsel from responding substantively to ATF's motion, as a complete bar on "use" would prevent discussion (at any level of generality) of the government activities revealed in the documents. After briefing, the Court entered a second minute order on October 5, 2023, denying Plaintiffs' request and stating that Plaintiffs' Motion "appear[s] to be asking the Court not to 'clarify' the minute order, but to revise it, to permit plaintiffs to review and possibly use the unredacted records in connection with their response to the motion for protective order. This should not be necessary, and it is not consistent with the clear directive from this Court that the inadvertently produced records be 'sequestered' until the matter is resolved."  The Court's October 5 Order did not address (and thus effectively denied) Plaintiffs' alternative request to file a brief under seal (*id.* at 6), or to have the Court consider the unredacted production *in camera* (*id.* at 4).

**ARGUMENT**

**I.    A Protective Order in a FOIA Case Is an "Extraordinary Ask" and Should Be Treated as Such.**

At the outset, "FOIA does not provide for the compelled return or destruction of inadvertently produced documents." *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 2023 U.S. Dist. LEXIS 151815, at *15-16 (D.D.C. Aug. 29, 2023); MPO at 4, 7. *See also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("once there is disclosure, the information belongs to the general public. There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination."); *but see Rocky Mountain Wild, Inc. v. U.S. Forest Service*, 56 F.4th 913 (10th Cir. 2022) (concluding that *Favish*'s use of "disclosure" applies only when there is "proper[] disclos[ure]").

Although cases considering agencies' requests for temporary sequestration orders in FOIA matters lack uniformity,[2] courts generally have agreed that they possess certain "inherent powers" that can be employed in appropriate cases to "bar parties from disseminating information inadvertently disclosed in FOIA proceedings, at least temporarily." *Cowan v. FCC*, 2022 U.S. Dist. LEXIS 166363, at *44 (D.D.C. Sept. 15, 2022) (emphasis added). Beyond such temporary orders (some courts question even that authority), courts also question whether they have any authority *at all* to issue clawback orders on a permanent basis. *See id.* at *46; *Pub. Citizen Health Rsch. Grp. v. FDA*, 953 F. Supp. 400, 404-05 (D.D.C. 1996) (emphasis added) (opining that no

---

[2] Defendant's Motion for a Protective Order fails to bring to the attention of the court any cases contrary to ATF's position, including those within this district. *See* ECF #20 (failing to mention *100Reporters*, *Memphis Publ'g Co.*, or *Sierra Club*, and omitting any discussion of *Cowan*'s language questioning judicial authority to provide the relief Defendant seeks). Defendant's Motion thus gives the impression that there is some united front of legal authority supporting its position, when the reality is far different.

constitutional question arose when "this order is *only temporary* in nature").  Additionally, judicial opinions on the issue routinely caution that "[a] court's inherent power is limited by the necessity giving rise to its exercise" because "there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority."  *Degen v. United States*, 517 U.S. 820, 829, 823 (1996).  Accordingly, courts recognize that "a request for protective relief in a FOIA case is an 'extraordinary' ask that should not be granted as a matter of course."  *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *46; *see also Sierra Club v. EPA*, 505 F. Supp. 3d 982, 991, 992 (N.D. Cal. 2020).  As the *Sierra Club* court explained, "[m]any mistakes by litigants have consequences," *id.* at 991, and this Court should reject Defendant's contrary notion that it automatically is entitled to a "mulligan" in spite of its negligence.  *See 100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 84 (D.D.C. 2022).

## II.    Defendant Advances a Self-Serving and Erroneous Legal Standard.

Defendant's Motion asks the Court to apply an erroneous legal standard, suggesting that a mere finding that a FOIA exemption *could have been applied* automatically authorizes the exercise of judicial power to order destruction, return, and nondisclosure of inadvertently produced unredacted documents.  *See, e.g.*, MPO at 3 ("[i]f ATF prevails on the merits of its claim that the material in question is shielded from public disclosure … the Court should then order Plaintiff and its counsel to destroy all copies"); ECF #25 Exhibit 1 (suggesting that the parties move to summary judgment briefing about whether certain redactions would have been appropriate, had they been made).[3]

---

[3] Even though Defendant's declaration (ECF #20-1) goes to great lengths to discuss the propriety of FOIA redactions *that were not made* here, resolution of Defendant's Motion does not involve whether certain FOIA exemptions properly *could have been* applied.  *See* MPO at 7 (admitting as much).  Indeed, the 'could have, would have, should have' horse has left the barn, and this matter now involves the Court's consideration of various factors (discussed below) to determine whether

Judge Moss recently rejected a nearly identical argument made by the State Department that, "if the Court finds that Defendant correctly asserted FOIA Exemptions," the Court should "direct Plaintiffs to return or destroy" the documents. *100Reporters*, 602 F. Supp. 3d at 84. As Judge Moss put it, this standard would afford the government "a mulligan." *Id.* (noting that the government "cites a single [out-of-circuit] decision" for its position, which "offers no legal analysis and cites no precedent in support of that directive," and concluding that the government "fails to identify any authority that the Court has to … take the extraordinary step of ordering a news organization and a journalist to return materials to a government agency, which they obtained through no unlawful or improper action"). Judge Moss denied the government's motion without prejudice, explaining that he would need "far more" in order to censor a journalist by ordering destruction of inadvertently produced records, but the State Department does not appear to have pursued the matter further. *See* Docket, *100Reporters v. U.S. Dep't of State*, No. 1:19-cv-01753-RDM (D.D.C.).

Judge Moss is not alone. Rather, as another judge of this Court recently explained, a finding that certain information *could have qualified* for an exemption "does not end the matter." *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *31. That opinion (at *47) cited with approval *Sierra Club v. EPA*, 505 F. Supp. 3d 982 (N.D. Cal. 2020), which similarly observed that there is no "compelling rationale for holding that a court should wield its inherent authority to compel the return or destruction of documents produced under FOIA any time the producing agency *could have invoked* a statutory exemption but inadvertently failed to do so." *Id.* at 991 (emphasis added).

---

it is appropriate to exercise an "extraordinary" power to order destruction of records that Defendant *did* release to Plaintiffs.

In other words, Defendant is not entitled to a 'get-out-of-jail-free' card from this Court simply because it *could have* applied various FOIA redactions that it, in fact, did not apply.

### III. The Appropriate Analysis Requires the Court Consider Several Factors, Which Weigh in Plaintiffs' Favor.

A review of the relatively few reported FOIA clawback cases "illustrate[s] several significant considerations" that guide courts' analyses. *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *44. These cases make clear that Defendant is not entitled to a protective order simply because unredacted material may fall within a FOIA exemption. Instead, to be entitled to such extraordinary relief, the unredacted material must serve "no discernible public interest" and be "reasonably … expected to harm" an interest that FOIA exemptions seek to protect. *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16; *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *45; *see, e.g.*, *ACLU v. DOD*, 2012 U.S. Dist. LEXIS 194264 (S.D.N.Y. Mar. 20, 2012) (permanent clawback order appropriate for an inadvertently disclosed classified military document that could harm national security); *Sierra Club*, 505 F. Supp. 3d at 991 (declining to compel destruction of inadvertently disclosed names and email addresses of petroleum lobbyists because "EPA has identified no serious and non-speculative harm likely to result"); *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16-17 (emphasis added) (order not to disclose, disseminate, or make use of inadvertently disclosed names of people who had brought claims against the Park Police appropriate because "there [wa]s no discernible public interest in having the names of private citizens disclosed" in that case). Courts also examine whether the agency discovered its own error or instead was notified by the requester (*ACLU*, 2012 U.S. Dist. LEXIS 194264, at *4; *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *11; *100Reporters*, 602 F. Supp. 3d at 83; *cf.* MPO at 2 ("Counsel's email alerted ATF to the inadvertent production")), and the extent and scope of the agency's negligence (*Memphis Publ'g Co. v. FBI*, 189 F. Supp. 3d 28, 30 (D.D.C. 2012)).

7

At bottom, courts recognize that an order commanding sequestration or destruction of records should not be granted reflexively, merely because the government asks, and that any exercise of such "extraordinary" judicial power must be "'a reasonable response to the problems and needs that provoke it.'"  *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16 (*citing Degen*, 517 U.S. at 823-24).  Most (if not all) of these factors weigh in Plaintiffs' favor here, and thus this Court should deny Defendant's Motion.

### A. ATF's Covert Surveillance of Lawful Firearm Purchasers Is a Matter of Great Public Concern that Has Sparked Not Only Keen Media Interest, but Also Attention from Congress.

Congress created NICS as a means for licensed dealers to verify quickly whether a prospective firearm purchaser is eligible to receive a firearm under federal and state law.  *See* 18 U.S.C. § 922(t)(2).  But it recently has been revealed that ATF and the FBI have been abusing that verification process to surveil Americans *who are eligible* to purchase firearms.  *See* ECF #20-1 at ¶14 ("Monitoring records is designed for suspects under investigation by ATF that are not otherwise prohibited.").  In April of 2021, journalist John Crump reported that leaked ATF documents revealed the agency's involvement in a covert, warrantless surveillance program of an untold number of law-abiding firearm purchasers, through daily monitoring[4] of all firearm transactions that are processed through the NICS system.[5]

The targets of this surveillance program are those merely suspected of having committed or being engaged in various crimes;[6] they do not receive notice that their transactions are being or

---

[4] This involves a daily check of the NICS Audit Log, because federal law requires information on approved transactions to be deleted within 24 hours.
[5] John Crump, *Leaked Document Shows ATF Spying on Gun Buyers Through NICS ~ VIDEO*, <u>AmmoLand</u> (Apr. 26, 2021), https://tinyurl.com/3fjvxckr.
[6] John Crump, *ATF & FBI Monitor Over 1,000 Law-Abiding Gun Owners*, <u>AmmoLand</u> (Oct. 22, 2021), https://tinyurl.com/y77fpzt7.

have been monitored, and there is no mechanism to appeal such surveillance – which can continue indefinitely, ungoverned by any law or regulation and unmonitored by any court.[7]    Under this surveillance scheme, virtually anyone can request surveillance – ATF records evidence requests not only from federal law enforcement agents (ATF and FBI), but also from state and local officials who participate in various task forces, and requests made even by *regulatory* personnel within ATF who are not supposed to engage in law enforcement.[8]    *See* ECF #20-1 ("agents and personnel").

Finally, although the FBI asks that requesters supply a reason to surveil a target, there is no minimum standard for such reasons (*e.g.*, probable cause, reasonable suspicion, etc.), or procedure for review of such justifications.    Thus, examples of tenuous justifications abound.    Even unverified anonymous tips suffice, suggesting the program is ripe for abuse with zero oversight whatsoever.[9]    In one case, ATF requested NICS monitoring of a man who purchased a shotgun shortly after news of the highly publicized Derek Chauvin verdict was released.    Strikingly, "[t]he agent did not even claim … that his suspect could be a straw purchaser.    He just said he *may* use a gun for rioting."[10]    Other requests arguably are even more troubling.    For example, ATF sought daily surveillance of numerous individuals because, in the agency's opinion after obtaining the

---

[7] Emily Miller, *EXCLUSIVE: Documents Show FBI and ATF Warrantless Surveillance Through Gun Background Checks*, Epoch Times, https://tinyurl.com/ycxf8a62 (Jan. 17, 2023).

[8] *See* ATF Industry Operations Manual at 1 (Oct. 2019), https://tinyurl.com/mpn52pjt (making clear that Industry Operations Investigators are regulatory personnel only and that they should report criminal violations to the appropriate authorities).

[9] Miller, *supra* note 7; Emily Miller, *EXCLUSIVE: ATF Gains Financial Information on Potential Gun Buyers for Warrantless Tracking, Documents Show*, Epoch Times, https://tinyurl.com/yebs5m7z (Mar. 23, 2023).

[10] Miller, *supra* note 7 (emphasis added). The man had commented about wanting to "get the shotgun tonight," which was apparently suspicious. *Id.* With no judicial determination of probable cause or even a legal standard to apply, an expression of one's anticipation of riots and the present desire to defend oneself apparently justified future, warrantless, open-ended transaction monitoring.

persons' financial records,[11] they were deemed *too poor* to be purchasing firearms for lawful purposes.[12] Even seeming firearm hobbyists have been tracked without their knowledge. In one such case, FBI monitored a man "for at least six months" on the grounds that "he had a 'habit' of purchasing new guns, tinkering with them, losing interest, and subsequently selling them" at a loss – all perfectly lawful conduct.[13] As of 2021, Defendant[14] and its FBI[15] counterparts were actively monitoring the NICS transactions of "over 1,000 American citizens," all the while collecting not only their personal information but also detailed information about their exercise of constitutional rights.[16]

Defendant, as a result of advocating the wrong standard, devotes only two sentences of its MPO to arguing there is no public interest in dissemination. MPO at 6. But even then, Defendant only makes that claim as to *some* of the categories of records it claims are at issue. *Id.* ("names, social security numbers, birth dates … email addresses, and phone numbers"). Obviously, Plaintiffs have no interest in anyone's social security number, and that is not what this litigation involves.

The documents now in question were produced by ATF in response to the request described above – but that is the entirety of what counsel is permitted to say about the disputed records. This Court's minute orders prevent Plaintiffs from saying anything more about those records – including whether there is a public interest in disclosure of various portions of the redacted records.

---

[11] Emily Miller, *EXCLUSIVE: Texas Coordinates with ATF to Share Income of Residents for Warrantless Monitoring*, <u>Epoch Times</u>, https://tinyurl.com/4fath9wy (Apr. 18, 2023).

[12] *See id.*; *see also* Miller, *supra* note 7.

[13] Emily Miller, *EXCLUSIVE: FBI Carried Out Warrantless Monitoring on Man Who Posted Guns for Sale on Facebook*, <u>Epoch Times</u>, https://tinyurl.com/yv6mm39c (July 25, 2023).

[14] https://tinyurl.com/ymr7wprx.

[15] https://tinyurl.com/4mm72svw.

[16] Crump, *supra* note 6.

Nevertheless, based on the coverage and inquiries about ATF's prior disclosures in this series, it is evident that there has been and continues to be a significant public interest in information related to the FBI and ATF's warrantless NICS Monitoring Program.  The articles cited above are just some of the examples of the broad media coverage this story has inspired.[17]  In addition, Members of Congress have taken interest in the story and called for reform.  *See* Exhibit 1, Declaration of Aidan Johnston at ¶¶9-10.  So too for state legislators.[18]  At least one piece of legislation has been shelved, in part, due to the negative attention brought by this story.  Exhibit 1 at ¶ 10.  *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 58 (D.D.C. 2008) ("Given the extent to which plaintiff's allegations have been found to be credible by the Senate Report, and the strong public interest in ferreting out possible improprieties at the SEC, disclosure is clearly warranted...").  Thus, even though barred from discussing the public's interest in the documents in question, it is clear the public interest weighs in Plaintiffs' favor here.

### B. The Public Has a Significant Interest in Learning About the NICS Monitoring Program, Which Violates Statutory Prohibitions and Constitutional Rights.

The Brady Handgun Violence Prevention Act of 1993 established the NICS System.  Pub L. No. 103-159, 107 Stat. 1536.  Pursuant to the Brady Act, the FBI is permitted to gather various information about prospective gun purchasers in order to run that information against records contained in various federal databases, to determine whether the prospective transferee is eligible

---

[17] *See, e.g.*, Guns & Gadgets 2nd Amendment News, *SHOCKER!!! FBI & ATF Caught SECRETLY Monitoring Gun Owners!!*, <u>YouTube</u> (Jan. 15, 2023), https://youtu.be/crVB8GRHlGU; God Family and Guns, *ATF Is Monitoring Your Gun Purchases : This Leaked Document Is Proof!!*, <u>YouTube</u> (Apr. 28, 2021), https://youtu.be/qlXCFooQVWo; Ben Whedon, *FBI, ATF Use Gun Background Checks to Track Specific Purchasers, Documents Show*, <u>Just the News</u>, https://tinyurl.com/mtuw3mtn (Jan. 13, 2023); P. Gardner Goldsmith, *Docs Reveal FBI, ATF Have Been Monitoring Law-Abiding Gun Buyers Through Federal Background Checks*, <u>mrcTV</u> (Jan. 17, 2023), https://tinyurl.com/yckzptp8; Dan Zimmerman, *FBI Monitoring Gun Owners Who Sell Firearms via Facebook*, <u>Truth About Guns</u> (July 23, 2023), https://tinyurl.com/mr4ay2mt.
[18] Miller, *supra* note 11.

to possess the firearm.  *See* 28 C.F.R. § 25.9(a).  However, aware of the potential for abuse when the government is handed information in real-time about firearm transfers (the exercise of an enumerated constitutional right), Congress explicitly prohibited the federal government from "establish[ing] … any system of registration of firearms, firearms owners, or firearms transactions or dispositions...."  18 U.S.C. § 926(a).  Likewise, Section 103(i) of the Brady Act, now codified at 34 U.S.C. § 40901, prohibits the government from "us[ing] [NICS] to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons, prohibited by section 922(g) or (n) of title 18 or State law, from receiving a firearm."  In order to give further teeth to those restrictions, starting in 2004 (and made permanent in 2012), Congress included annual appropriations provisions requiring the FBI to destroy all NICS records of "approved" firearm transactions within 24 hours.  Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3, 95; 28 C.F.R. § 25.9(b)(1)(iii).

In 1998, contemporaneously with the effective date of the Brady Act, the FBI enacted a regulation promising that "the FBI will not establish a federal firearms registry.  The FBI is expressly barred from doing so...."  63 *Fed. Reg.* 58303 (Oct. 30, 1998).  The FBI assured that it would use the newly created NICS Audit Log (a record of all firearm transactions that are run through the system) "solely for the purpose of satisfying the statutory requirement of ensuring the privacy and security of the NICS and the proper operation of the system."  *Id.*  Directly responding to "concern that the Audit Log would allow [states] and law enforcement agencies access to records of approved transfers," the FBI promised that this was a non-issue, as "such information is available only to the FBI and only for the purposes of conducting audits...."  *Id.* at 58304.

But the FBI's promise did not last long.  Only one month later, another FBI rulemaking adopted a regulation to permit that very same "disclosure" of Audit Log records to "law

enforcement agencies … [i]f, during the course of any activity or operation of the system authorized by regulations … any record is found by the system which indicates" a violation of law. 63 *Fed. Reg.* 65227 (Nov. 25, 1998).  In 2004, the FBI further watered down that regulatory language, the current form of which now provides that "[i]nformation in the NICS Audit Log, including information not yet destroyed … that indicates … a violation or potential violation of law or regulation, may be shared with appropriate authorities responsible for investigating, prosecuting, and/or enforcing such law or regulation."  28 C.F.R. § 25.9(b)(2)(ii).  The NICS Monitoring Program is purportedly justified based on that regulation.  *See* ECF #20-1 ¶14.

As further detailed below, the NICS Monitoring Program (i) conflicts with the statutory text, (ii) operates without warrant and often without any reasonable or particularized suspicion, (iii) permits requests for monitoring from, and shares information with, non-law enforcement personnel, (iv) violates the Second and Fourth Amendments, (v) defies congressional intent, and (vi) has caused members of Congress serious concerns, irrespective of constitutionality or legality. For each of these reasons, the American public has an overriding interest in learning more about the NICS Monitoring Program.

First, the program conflicts with 18 U.S.C. § 922(t)(2)(C), which flatly requires destruction of "all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer." When ATF (and other) personnel request warrantless NICS surveillance of individuals, FBI's copying, retention, and forwarding of such records necessarily preserves a record "relating to" a NICS-based transaction, contrary to the statute's unyielding imperative that such a record be "destroy[ed]," and in violation of the congressional and regulatory imperative that such destruction take place "within 24 hours after the FFL receives communication of the determination that the

transfer may proceed." 18 U.S.C. § 922(t)(2)(C); 28 C.F.R. § 25.9(b)(1)(iii); 118 Stat. 3, 95. Defendant's claim that the FBI's *regulation* permits such unlawful retention does not cure this *statutory* violation.

Second, the program utilizes warrantless and sometimes even suspicionless surveillance to accumulate firearm purchase records from people *who are not prohibited* from possessing firearms. *See supra* notes 5-13 (reporting on various instances of surveilling innocuous and lawful behavior). The NICS Monitoring Program enables unaccountable agency monitoring, in real time, of the time and place of a target's Second Amendment activity, which is analogous to the information gathered via pen registers and "trap and trace" devices for phone calls. *See* 18 U.S.C. § 3127(3), (4) (providing that the call information gleaned shall "not include the contents of any communication").[19] The Monitoring Program also provides information about the firearms themselves, linking make, model, and serial number to a person's name, address, and other identifying information – analogous to the government monitoring what books a person borrows from the library, or what websites he visits.[20]

Third, the program has allowed access to NICS information by all sorts of government persons – a "requestor can be a 'Special Agent, Industry Operations Investigator (IOI), Intelligence

---

[19] In the case of pen registers and "trap and trace" devices, Congress recognized the risk of abuse and accordingly made federal law *require* "[c]*ourt approval* … to obtain" such surveilled information. C.J. Williams & Sean R. Berry, Federal Criminal Practice 31 (2d ed. 2021) (emphasis added); *see* 18 U.S.C. § 3122. In stark contrast, the NICS Monitoring Program requires no court approval. Nor could it, as it lacks any statutory basis. Here, Congress did not even permit court approval to allow retention of NICS Audit Log records, instead requiring their destruction *without exception*.

[20] *See, e.g.*, *Riley v. California*, 573 U.S. 373, 395, 396 (2014) (requiring a warrant to search a cell phone's contents and noting that "[a]n Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns" and "[d]ata on a cell phone can also reveal where a person has been").

Research Specialist, Intelligence Analyst, etc.'"[21]  Yet such personnel are not law enforcement persons, do not investigate or prosecute criminal violations of federal law, and certainly have no business monitoring and retaining records of Americans' gun purchases.

Fourth, the program violates the Second and Fourth Amendments.  When the Second Amendment's plain text "covers" an individual's conduct (in this case, the acquisition of arms, a threshold step to "keep[ing]" arms by persons that the government concedes are eligible to possess them), such conduct is presumptively protected, and governmental regulations affecting that conduct[22] must find support in widespread Founding-era tradition.  *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).  Obviously, no such tradition of government monitoring exists, so Defendant's program violates the right to keep and bear arms.  Further, the "basic purpose of [the Fourth] Amendment[] … is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967).  Just as how "individuals have a reasonable expectation of privacy in the whole of their physical movements" and "society[] expect[s] … that law enforcement agents and others would not – and indeed, in the main, simply could not – secretly monitor and catalogue every single movement of an individual's car for a very long period," so too is there a reasonable expectation of privacy from daily surveillance in one's personal firearm transactions and a societal expectation that law enforcement does not "secretly monitor and catalogue every single" such transaction.  *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).  After all, the public should be able to reasonably *expect* that the government does exactly what the law says – that it destroys "all records of the system relating to the person or the transfer" within "24 hours."  18 U.S.C.

---

[21] Crump, *supra* note 5.
[22] Indeed, news that the government is surveilling unknown targets' firearm purchases can and will discourage people from purchasing firearms for fear of appearing "on a list."

§ 922(t)(2)(C); 28 C.F.R. § 25.9(b)(1)(iii).  If the government does not, such a program is unreasonable, unwarranted, and offensive to the Fourth Amendment.

Fifth, the program operates contrary to Congress's expressly stated plan for the NICS system, which was that the federal government would be barred from keeping or using records related to Americans' firearms purchases beyond the initial check.  It is deeply ironic that the present dispute involves the government's effort to prohibit the use and compel the destruction of records about a secret government program that uses and refuses to destroy records about gun sales in defiance of Congress.

Sixth, aside from the constitutionality or legality of the NICS Monitoring Program, state and federal legislators are concerned about Defendant's overreach.  It is not a stretch to believe that such persons may seek to use legislative means to rectify the FBI and ATF's abuse of the NICS system.

Ultimately, the Court's view of Plaintiffs' arguments regarding ATF abuses with respect to the NICS Monitoring Program does not resolve the issue.  What matters is the fact that there are serious arguments that the program is both unconstitutional and unlawful.[23]  It is clearly in the public interest to learn more about this government surveillance program occurring behind closed doors.

## C. Defendant Has Failed to Argue that Plaintiffs' Possession or Even Limited Use of Certain Redacted Records Will Lead to Harm.

As to the reasonable expectation of harm factor, *Cowan* is instructive.  Notably, Defendant cites *Cowan*, but only as a prior instance of a court granting a partial protective order.  MPO at 5.  Yet the *Cowan* court explicitly noted that even satisfaction of a FOIA exemption's criteria "does

---

[23] Again, the Court's minute orders prevent Plaintiffs from discussing (even generally) the legality or constitutionality of any portion of the redacted records.

not end the matter" because FOIA, as amended, prohibits the government from withholding even properly exempt materials "unless it also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA exemption."  2022 U.S. Dist. LEXIS 166363, at *31.  That judge then "request[ed] that the parties supplement the record to demonstrate the harm that will result from the public disclosure of the withheld materials."  *Id.* at *47.

This Court's minute orders prevent Plaintiffs from arguing whether there is any legitimate use(s) for any discrete part(s) of the redacted records at issue, or opining whether such use(s) might lead to any sort of harm.  But even so, Defendant's Motion completely omits any discussion of this factor that is necessary to the Court's analysis.  To be sure, Defendant's declaration contains various allegations (ECF #20-1 ¶¶ 20,[24] 26, 28), but none of them contain citations to legal authority, and none are incorporated into Defendant's Motion, much less buttressed with sound legal argument.  Of course, "a court may disregard legal arguments improperly set forth in a declaration." *Elghossain v. Bank Audi S.A.L.*, 2023 U.S. Dist. LEXIS 175684, at *37 (S.D.N.Y. Sept. 29, 2023); *see also Shapiro v. DOJ*, 507 F. Supp. 3d 283, 299 (D.D.C. 2020) ("The Court … assur[ed] Plaintiffs that it would disregard legal arguments in the declarations....").

Even so, Plaintiffs have expressed their desire to narrow the scope of what is in dispute (ECF #25 at 2).  Although this Court's minute orders prevent Plaintiffs from discussing even the sorts of redacted records at issue, ATF has already described various categories of information it

---

[24] In its declaration, ATF claims that "[p]ublic release of [the records] would create substantial risks that **ongoing** Federal, state, and local law enforcement **investigations** would be prematurely disclosed and could thereby jeopardize those investigations...."  ECF #20-1 at ¶20 (emphasis added).  But that claim directly conflicts with ATF's prior claim in its Joint Status Report that the records at issue here are "associated with **now-closed investigations**...."  ECF #18 ¶2 (emphasis added).  Indeed, that was ATF's professed reason for reprocessing those records.  *Id.*

claims are contained in the redacted records.  *See, e.g.*, ECF #20-1 at ¶28 (emphasis added) ("*the information ... reveals*").

For example, ATF reports that the redactions contain "personally identifying information of the subjects of its investigation, including **birth dates** and **social security numbers**."  ECF #20 at 4 (emphasis added).  To the extent that is true, neither Plaintiffs nor counsel have any interest in such information, and would agree to destroy any such records.  However, this Court's order effectively prohibits destruction of some *portions* of records without destroying *all* of the records.

Likewise, ATF reports that "each email includes the **names**, **email addresses**, and sometimes **telephone numbers** for multiple ATF and FBI agents and staff."  ECF #20-1 at ¶15.  To the extent that is true, neither Plaintiffs nor counsel have any interest in the names, email addresses, or telephone numbers of government personnel, and would destroy any such records.

Nor do Plaintiffs or counsel have any interest in the identity of "citizens who provided information to the Government in support of a criminal investigation … witnesses or confidential sources...."  ECF #20-1 at ¶¶15, 25.  The same for "various law enforcement file numbers and codes."  *Id*. ¶28.

Plaintiffs submit that destruction of any such portions of the records would alleviate the harms that Defendant's declaration alleges could occur.  This Court should not conclude that any harm is likely to occur from Plaintiffs' possession of any other categories or portions of the redacted records Defendant claims exist, without knowing what those redactions might be, what they might show, and how they might be used.

**IV.    The Government's Request that the Court Order Destruction of Inadvertently Disclosed, Newsworthy Documents Invites an Unconstitutional Prior Restraint.**

As this Circuit explains, "sunlight is said to be the best of disinfectants."  *Jud. Watch, Inc. v. U.S. Dep't of State*, 344 F. Supp. 3d 77, 78 (D.D.C. 2018) (quoting Justice Brandeis).  While

Defendant may prefer that various details of its covert monitoring activities never see the light of day, its Motion for Protective Order seeks relief that conflicts with core First Amendment rights. Even in the best of scenarios, an agency's request that a court order a FOIA requester destroy documents is an "'extraordinary' ask that should not be granted as a matter of course." *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *46. Such a request becomes even more suspicious when the government asks a court to command a nonprofit, public-interest organization, that has repeatedly engaged in quintessential press activity with regard to the very matter at issue, to destroy voluntarily disclosed government records of a warrantless surveillance program. The government's ask here thus represents a request for a classic prior restraint that is subject to the strongest presumption of invalidity. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971); *see also Times-Picayune Publ'g Corp. v. Schulingkamp*, 419 U.S. 1301, 1307 (1974).[25]

To be sure, the Supreme Court has recognized a few clearly delineated and carefully circumscribed exceptions to the First Amendment's flat ban on prior restraints, such as courts' "special solicitude for preserving fairness in a criminal trial," *Times-Picayune*, 419 U.S. at 1307, sealed documents that are considered "judicial records,"[26] or presentencing reports prepared for

---

[25] Prior restraints are among the most heavy-handed restrictions on expressive rights, in that they prevent speech from ever occurring. *See Bd. of Trs. of Leland Stanford Junior Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) (noting that "a prior restraint on speech … allows the government to suppress the dissemination of information in advance of publication"). Accordingly, "[p]rior restraints are permitted 'only in exceptional cases,'" *id.* (quoting *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931)), because generally, "[e]ven a restraint of speech for a limited period is inconsistent with the First Amendment." *Id.* n.7; *see also Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers) ("It is clear that even a short-lived 'gag' order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect."); *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) ("Where … a direct prior restraint is imposed upon the reporting of news by the media, each passing day may constitute a separate and cognizable infringement of the First Amendment.").

[26] *Pub. Citizen Health Rsch. Grp.*, 953 F. Supp. at 405; *see also Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105 (1979) (distinguishing "unlawful press access to confidential judicial proceedings").

judges in criminal cases.  *See, e.g.*, *United States v. Smith*, 123 F.3d 140, 152 (3d Cir. 1997) (collecting cases).  But none of those scenarios is even arguably implicated here.  Nor does this case involve FOIA documents "inadvertently included with the material supporting defendants' joint motion to dismiss" filed with a court.  *Astley v. Lawson*, 1991 U.S. Dist. LEXIS 21611, at *27 (D.D.C. Jan. 11, 1991).  Nor can Defendant rely on authorities discussing protective orders relating to civil discovery, where "[a] litigant has no First Amendment right of access to information made available *only for purposes of trying his suit*."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (emphasis added).

None of these exceptions applies when a government party voluntarily, yet allegedly inadvertently, produces FOIA material to a requester outside of a court's docket or discovery procedures.  Indeed, the D.C. Circuit has recognized that *Seattle Times* "emphasized that a 'party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes,' and upheld the order at issue in that case in part because it did 'not restrict the dissemination of the information if gained from other sources.'"  *In re Rafferty*, 864 F.2d 151, 155 (D.C. Cir. 1988) (citation omitted); *see also P&G v. Bankers Tr. Co.*, 78 F.3d 219, 225 (6th Cir. 1996) (finding that *Seattle Times* "does not govern the situation where an independent news agency, having gained access to sealed documents, decides to publish them").

Here, Plaintiffs did not "gain[] the information … only by virtue of the trial court's discovery processes" or any other "court[] … process[]."  *Rafferty*, 864 F.2d at 155.  Nor did Plaintiffs employ any deception, ploy, trickery, or other scheme to obtain the unredacted records.  Rather, Plaintiffs (entirely unbeknownst to them) were handed unredacted materials by Defendant

itself, pursuant to Defendant's statutory FOIA obligations that exist separate and apart from this case.

The only cases of which Plaintiffs are aware which have dealt with a First Amendment claim in an "inadvertent disclosure" FOIA case are *ACLU v. DOD*, 2012 U.S. Dist. LEXIS 194264, at *14 (S.D.N.Y. Mar. 20, 2012) (finding that "classified information remains classified notwithstanding 'any unauthorized disclosure,'" notwithstanding "that Plaintiffs acquired the Document innocently"), and *Pub. Citizen Health Rsch. Grp. v. FDA*, 953 F. Supp. 400, 404 (D.D.C. 1996) (finding First Amendment case law "distinguishable" because the case involved a third-party intervenor, and not "the party that disclosed the information [*i.e.*, the government agency] seeking to prevent its dissemination").    However, in deciding that case, Judge Urbina acknowledged that a permanent court order "prohibiting [a party] from disseminating or using the information contained in [an inadvertently released FOIA document]" might create "First Amendment concern[s]," being "'the kind of classic prior restraint that requires exacting First Amendment scrutiny.'"  953 F. Supp. at 404-05 (citing *Seattle Times*, 467 U.S. at 26).

As noted above, Plaintiffs' First Amendment argument should not be construed as a desire to publicize or use the social security numbers or birth dates of subjects of government monitoring, or the identifies of confidential informants (*see* ECF #20-1 ¶25), information for which there is no public interest in dissemination.  Nor do Plaintiffs have any desire to publicize or use contact information for government officials (*see id.* ¶15).  But, as Defendant alleged, the redacted records also "reveal[]" information such as "some discussion of the investigation," including "allegations of wrongdoing" and "specific law enforcement procedures and techniques" and "some discussion of [an] investigation."  *Id.* ¶¶15, 25, 28.  This Court's minute orders prohibit Plaintiffs from "us[ing] [the] records or their contents for any purpose," to include even generally describing what

sorts of information might be in the records, whether any such government activities revealed might be unlawful or unconstitutional, whether the public has any interest in knowing about it, or whether any harm would occur.  *See Multi AG Media LLC v. Dep't of Agric.*, 380 U.S. App. D.C. 1, 8 (2008) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)) (discussing FOIA's "basic purpose" as being "the citizens' right to be informed about what their government is up to").  Nevertheless, this Court certainly could infer from Defendant's persistence that various portions of the documents may be newsworthy.  A court order "[p]rohibiting the publication of a news story or an editorial" is a prior restraint and violates the First Amendment, "the essence of censorship."  *In re Providence Journal Co.*, 820 F.2d 1342, 1345 (1st Cir. 1986).

## CONCLUSION

It is a sad and ironic twist that the ATF professes its desire to protect the privacy of gun owners, considering this case involves ATF's covert surveillance program that for years has been spying on, invading the privacy of, and gathering private information about those very persons.  It is more ironic still that ATF seeks to protect that information vis-à-vis Plaintiffs, nonprofit organizations whose mission is to protect and defend the rights (including the privacy) of gun owners against government infringement.  This Court should deny Defendant's request to force Plaintiffs to sequester, to not use, and to destroy records about a secret government program that fails to sequester, nefariously uses, and fails to destroy records about gun sales that Congress's own *statutory protective order* declares must be destroyed and not used.

Alternatively, should this Court grant the relief that Defendant seeks, including that Plaintiffs and counsel destroy the records in question, Plaintiffs respectfully ask the Court to stay that part of its ruling pending the opportunity for Plaintiffs to seek appellate review.

                                                Respectfully submitted,

October 13, 2023

_s/ Stephen D. Stamboulieh_                     George L. Lyon, Jr. (D.C. Bar No. 388678)
Stephen D. Stamboulieh                          Bergstrom Attorneys
Stamboulieh Law, PLLC                           4000 Legato Road, Suite 1100
P.O. Box 428                                    Fairfax, VA 22033
Olive Branch, MS  38654                         202-669-0442, fax 202-483-9267
(601) 852-3440                                  gll@bergstromattorneys.com
stephen@sdslaw.us
DC District Court Bar# MS0009                    Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, Stephen D. Stamboulieh, hereby certify that on the 13th of October 2023, I have caused the foregoing document or pleading to be filed with this Court's CM/ECF system which generated a notice and delivered the document to all counsel of record.

_By: Stephen D. Stamboulieh_
Stephen D. Stamboulieh