## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUN OWNERS OF AMERICA, INC., *et al.*,    )
                                                       )
    Plaintiffs,                         )
                                                       )
    v.                                     )         Civil Action No. 21-2919 (ABJ)
                                                       )
BUREAU OF ALCOHOL, TOBACCO,     )
FIREARMS AND EXPLOSIVES,         )
                                                       )
    Defendant.                      )
                                                       )

## PLAINTIFFS' RESPONSE[1] TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### BACKGROUND AND STATEMENT

This case originated with a Freedom of Information Act ("FOIA") Request made by Gun Owners of America, Inc. and Gun Owners Foundation ("Plaintiffs") to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or "Defendant") on April 28, 2021. ECF #1-1. In it, Plaintiffs sought records related to a secret surveillance program administered by the Federal Bureau of Investigation ("FBI") and used by federal and state law enforcement agencies, including ATF, to monitor and record the firearm purchases of certain American citizens who are eligible to purchase and possess firearms.

---

[1] Although Defendant styles its motion a "Motion for Summary Judgment," its Memorandum in Support and proposed order seek not only a grant of summary judgment but also further relief in the form of a permanent protective order against Plaintiffs' use of certain information that Defendant disclosed to Plaintiffs. *Cf.* ECF #32 at 1 with *id.* at 19 and ECF #32-2. Thus, Plaintiffs style this filing a "Response" to Defendant's Motion for Summary Judgment, rather than an Opposition, as the only disputed issue between the parties is Defendant's motion for a permanent protective order, ECF #20, not summary judgment (Defendant's Motion for Summary Judgment, ECF #32). Accordingly, Plaintiffs have not filed a cross-motion for summary judgment.

When ATF failed to respond to this request for well over a year,[2] Plaintiffs filed suit on July 5, 2022.  Over the ensuing months, ATF made a series of 12 productions of records to Plaintiffs, revealing in detail how the National Instant Criminal Background Check System ("NICS") Monitoring Program has been used to surveil – without a warrant, and often without any particularized suspicion at all – an untold number of Americans whose firearm transactions *are approved* by the FBI and thus are *found eligible* to purchase and possess firearms.

ATF and FBI justify this monitoring program not based on any authority found in federal law.  In fact, federal law expressly denies the federal government the authority to keep records of guns or gun owners, and requires the FBI to destroy information about approved gun transfers (the "NICS Audit Log") within 24 hours.  *See* Section IV. B, *infra*.  To justify violation of this congressional statute, Defendant relies entirely on an FBI regulation adopted in 2004 which purports to permit the FBI, within that 24-hour window, to copy, extract, and share information from the NICS Audit Log "with appropriate authorities responsible for investigating, prosecuting, and/or enforcing such law or regulation."  *See* ECF #32-4 ¶10.  In addition to the FBI's regulation being in violation of the statute (and the underlying congressional intent which requires rapid destruction of NICS records on gun owners), the FBI refuses to administer the NICS Monitoring Program according to its own defective regulation.  Further, from a constitutional perspective, this practice amounts to warrantless surveillance of gun owners – monitoring in real time how Americans exercise their Second Amendment rights – in violation of the Fourth Amendment.  The redacted documents previously released by ATF have revealed a vast illegal surveillance program,

---

[2] On the same date, Plaintiffs submitted an identical request to the FBI (FOIPA Request No. 1495550-000).  The FBI, unlike ATF, promptly processed and released responsive records, including spreadsheets demonstrating that the FBI and ATF were *actively* monitoring more than a thousand persons.  *See* https://tinyurl.com/ymr7wprx; https://tinyurl.com/4mm72svw.

generating broad media coverage, attention from state legislators, and significant opposition from Members of Congress.

On September 6, 2023, Defendant ATF made a thirteenth production to Plaintiffs, which is the subject of these proceedings.  That ATF production contained FOIA redactions that were indicated, but not actually made.  After Plaintiffs' counsel promptly notified counsel for Defendant of this fact,[3] asking for a redacted version to be shared with the press, ATF and its counsel responded with an increasingly aggressive series of demands that Plaintiffs' counsel immediately destroy all copies of the unredacted production and provide written confirmation that this was done.  Even though Plaintiffs' counsel explained that there was no urgency, representing that no dissemination of the records had taken place, and none would take place until the matter could be resolved in court, ATF hurriedly filed an "expedited" (ECF #30 at 1) motion seeking an unnecessary protective order.  ECF #20 ("MPO" or "Motion").  On September 18, 2023, this Court entered a minute order granting Plaintiffs additional time to respond, but also largely granting (in an interim form) the relief sought by Defendant, ordering that, "pending resolution of the motion for protective order, plaintiff must sequester the FOIA records that were inadvertently produced on September 6, 2023, and that it shall not disseminate, disclose, or use those records or their contents for any purpose pending the Court's ruling on the Motion for Protective Order."

Thereafter, Plaintiffs filed a Motion to Clarify (ECF #25), seeking guidance as to whether the Court's minute order's barring any "use" of the documents should be understood to prevent counsel from responding substantively to ATF's motion, as a complete bar on "use" would prevent discussion (at any level of generality) of the government's troublesome activities revealed in the documents.  After briefing, the Court entered a second minute order on October 5, 2023, denying

---

[3] *See* ECF #32 at 2 ("Plaintiff's counsel … alerted ATF to the fact of the inadvertent production").

Plaintiffs' request and stating that Plaintiffs' Motion "appear[s] to be asking the Court not to 'clarify' the minute order, but to revise it, to permit plaintiffs to review and possibly use the unredacted records in connection with their response to the motion for protective order. This should not be necessary, and it is not consistent with the clear directive from this Court that the inadvertently produced records be 'sequestered' until the matter is resolved." The Court's October 5 Order did not address (and thus effectively denied) Plaintiffs' alternative request to file a brief under seal (ECF #25 at 6), or to have the Court consider the unredacted production *in camera* (*id.* at 4).

On October 13, 2023, Plaintiffs filed their Opposition to Defendant's Motion for Protective Order, ECF #28.  On October 20, 2023, ATF filed its reply, ECF #29.  On October 30, 2023, this Court granted ATF's motion and "ORDERED that, until further order of this Court, plaintiffs and their counsel (1) shall sequester the September 6, 2023, inadvertently produced FOIA records and the contents of those records, and (2) shall not disseminate, disclose, or use for any purpose those records or the contents of those records." ECF #30.  The Court's opinion did not address many of the arguments raised by Plaintiffs in their opposition, instead focusing on the "temporary" nature of the order, "the Court's implied power to issue a temporary protective order," and questioning whether Plaintiffs' "cited cases … apply to *temporary* protective orders."  *Id.* at 1, 3 (emphasis original).

On November 14, 2023, the parties submitted a Joint Status Report laying out their respective positions for further proceedings.  ECF #31.  While Defendant announced its intent to move for summary judgment arguing, *inter alia*, that its allegedly planned redactions in Production 13 would have been appropriate had they been made (*id.* at 2-3), Plaintiffs explained that they had no intent to challenge any of those claimed exemptions (a moot issue, because the redactions had

not actually been made) and questioned whether summary judgment briefing was necessary or appropriate (*id.* at 2). On November 16, 2023, the Court issued a Minute Order setting summary judgment briefing.

The Court's November 16, 2023 Minute Order (ECF #31) appears to adopt Defendant's position of the case, explaining that the Court's Protective Order "bars the use or dissemination of this material *unless and until* the Court determines that the portions of the documents defendant maintains should have been redacted are not properly covered by an exemption and should be disclosed." (Emphasis added.) The Court further stated more explicitly that "the Protective Order is to remain in place *unless* the Court finds that the exemptions were not properly invoked." (Emphasis added.) Thus, the Court's order seems to indicate that the only issue the Court currently intends to address is the legality of the redactions Defendant allegedly intended to make (which Plaintiffs have not and do not challenge[4]) and, if the Court agrees with the basis for Defendant's redactions, then to issue a permanent protective order. For the reasons set out below, that would be error.

On December 8, 2023, Defendant filed its Motion for Summary Judgment and accompanying documents, ECF #32 ("MSJ"), briefing the above issues. Defendant also now briefs the issue of "foreseeable harm" (*id.* at 14-15), which was conspicuously lacking from its prior briefing (*see* ECF #28 at 16). Finally, while Defendant previously asked the Court to "order

---

[4] This requires the Court to issue something of an advisory opinion about issues that are not in dispute between the parties, without the benefit of any briefing or argument in opposition to Defendant's claim of FOIA exemptions. *See Oil, Chemical & Atomic Workers International Union v. Missouri*, 361 U.S. 363, 367 (1960) ("the duty of this Court 'is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'").

Plaintiff and its counsel to _destroy_ all copies [sic] the 115-page inadvertent production" (ECF #20 at 7, emphasis added),[5] Defendant's most recent ask omits that request (ECF #32 at 19).[6]

## ARGUMENT

### I.    Plaintiffs Take No Position on Most of Defendant's Claims.

ATF spends the majority of its briefing arguing that various redactions that could have been made, would have been appropriate under various FOIA exemptions, had they been made, even though they were not made.  MSJ at 4-13.  ATF also argues that it has produced to Plaintiffs all information from the partially redacted records that was "reasonably segregable."  _Id_. at 13-14; _see also_ ECF #32-4 ¶8.  Lastly, ATF argues that its alleged inadvertent disclosure of information to Plaintiffs does not "constitute[] a waiver of ATF's claimed exemptions … to the extent Plaintiffs would argue" so,[7] and that "the actions of ATF cannot waive the FBI's exemption claims."  _Id_. at 15-17.

Plaintiffs take no position with respect to these arguments.  As Plaintiffs have repeatedly explained, they have no interest in the vast majority of the redacted information ATF disclosed, and so many (if not the majority) of ATF's claimed exemptions have no bearing on the matter the Court needs to decide[8] – a permanent protective order against limited uses of small portions of unredacted information.  Moreover, as Plaintiffs have argued, the question of whether ATF

---

[5] _See also_ ECF #29 at 3 (emphasis added) (it "is not the case … that ATF is **_presently_** seeking a court order that Plaintiffs destroy the inadvertently produced records….").

[6] To the extent that the Court would consider or grant such relief (wholesale destruction of the records at issue) that Defendant apparently no longer is seeking, Plaintiffs request that the Court stay any such order pending appellate review.

[7] Plaintiffs have not made this "waiver" argument.

[8] For example, ATF relies on Exemption 7(C) with respect to personal information about "law enforcement personnel" (MSJ at 8-9), but Plaintiffs have already disclaimed any interest in agents' (and staff) names and contact information (ECF #28 at 18).  Similarly, ATF argues against disclosure of "the name of a confidential source" under Exemption 7(D) (MSJ at 11), but Plaintiffs have disclaimed any interest in that information as well (ECF #28 at 18).

properly *could have* applied certain redactions – which it *did not* apply – is not dispositive of this Court's consideration of whether to enter a permanent protective order. *See* ECF #28 at 5-7.

## II.    A Protective Order in a FOIA Case Is an "Extraordinary Ask" and Should Be Treated as Such.

At the outset, "FOIA does not provide for the compelled return or destruction of inadvertently produced documents." *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 2023 U.S. Dist. LEXIS 151815, at *15-16 (D.D.C. Aug. 29, 2023); MPO at 4, 7; ECF #30 at 2. *See also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("once there is disclosure, the information belongs to the general public. There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination."). *But see Rocky Mountain Wild, Inc. v. U.S. Forest Service*, 56 F.4th 913 (10th Cir. 2022) (concluding that *Favish*'s use of "disclosure" applies only when there is "proper[] disclos[ure]").[9]

The legal issue of how courts should address inadvertently produced documents is not novel. And, although cases considering agencies' requests for temporary sequestration orders in FOIA matters lack uniformity,[10] courts generally have agreed that they possess certain "inherent

---

[9] This Court's prior order adopts the Tenth Circuit's position with respect to *Favish*, claiming that the Supreme Court's use of the word "*disclosure*" is limited to "*properly disclosed*" records. ECF #30 at 3. But there is nothing evident from the face of the opinion that the Supreme Court intended its statement to be so limited. Rather, the issue before the *Favish* Court was the Ninth Circuit's conclusions about the scope of 7(C)'s privacy exemption, and the correctness of its order that four "death-scene photographs" must be released. In requiring a showing of evidence of government malfeasance to make a public interest claim and override a claimed privacy interest, the Court noted that "[t]here is no mechanism under FOIA for a protective order … proscribing [] general dissemination" of disclosed records. 541 U.S. at 174. In other words, *Favish* ultimately involved a decision that a lower court's order of *disclosure had been improper*.

[10] Defendant's Motion for a Protective Order failed to bring to the attention of the court any cases contrary to ATF's position, including those within this district. *See* ECF #20 (failing to mention *100Reporters*, *Memphis Publ'g Co.*, or *Sierra Club*, and omitting any discussion of *Cowan*'s language questioning judicial authority to provide the relief Defendant seeks). Defendant's Motion

powers" that can be employed in appropriate cases to "bar parties from disseminating information inadvertently disclosed in FOIA proceedings, <u>at least temporarily</u>." *Cowan v. FCC*, 2022 U.S. Dist. LEXIS 166363, at \*44 (D.D.C. Sept. 15, 2022) (emphasis added); ECF #30 at 1. Beyond such temporary orders (with some courts questioning even that authority), courts question whether they have any authority *at all* to issue clawback orders on a <u>permanent basis</u>. *See Cowan*, 2022 U.S. Dist. LEXIS 166363, at \*46; *Pub. Citizen Health Rsch. Grp. v. FDA*, 953 F. Supp. 400, 404-05 (D.D.C. 1996) (emphasis added) (opining that no constitutional question arose when "this order is *only temporary* in nature"); ECF #30 at 4 ("no harm will flow from [a temporary] order").

Additionally, judicial opinions on the issue routinely caution that "[a] court's inherent power is limited by the necessity giving rise to its exercise" because "there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Degen v. United States*, 517 U.S. 820, 829, 823 (1996). Accordingly, courts recognize that "a request for protective relief in a FOIA case is an 'extraordinary' ask that should not be granted as a matter of course." *Cowan*, 2022 U.S. Dist. LEXIS 166363, at \*46; *see also Sierra Club v. EPA*, 505 F. Supp. 3d 982, 991, 992 (N.D. Cal. 2020). As the *Sierra Club* court explained, "[m]any mistakes by litigants have consequences," 505 F. Supp. 3d at 991, and this Court should reject Defendant's contrary notion that it automatically is entitled to a "mulligan" in spite of its negligence. *See 100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 84 (D.D.C. 2022).

---

thus gave the impression that there is some united front of legal authority supporting its position, when the reality is far different. Similarly, Defendant's Motion for Summary Judgment (ECF #32) omits any discussion of these cases. *But see* ECF #32 at 18 n.1 (ATF obliquely "incorporat[ing] its briefing in favor of a protective order").

**III.    Defendant Urges Use of a "Mulligan" Standard Previously Rejected by Other Judges of this Court.**

Defendant continues to ask the Court to apply an erroneous legal standard, suggesting that a mere finding that a FOIA exemption *could have been applied* automatically authorizes the exercise of judicial power to order destruction, return, and nondisclosure of inadvertently produced unredacted documents.  *See, e.g.*, MSJ at 1-2 ("[b]ecause the redactions intended to be applied … are properly covered by various FOIA exemptions … the existing Protective Order should remain in place."); *see also id.* at 17 ("[s]hould the Court agree with ATF and the FBI that the information in the thirteenth production … is properly exempt … then the appropriate action would be to leave the existing protective order in place."); MPO at 3 ("[i]f ATF prevails on the merits of its claim that the material in question is shielded from public disclosure … the Court should then order Plaintiff and its counsel to destroy all copies").

Judge Moss of this Court recently rejected a nearly identical argument made by the State Department that, "if the Court finds that Defendant correctly asserted FOIA Exemptions," the Court should "direct Plaintiffs to return or destroy" the documents.  *100Reporters*, 602 F. Supp. 3d at 84.  As Judge Moss put it, this standard would afford the government "a mulligan."  *Id.* (noting that the government "cites a single [out-of-circuit] decision" for its position, which "offers no legal analysis and cites no precedent in support of that directive," and concluding that the government "fails to identify any authority that the Court has to … take the extraordinary step of ordering a news organization and a journalist to return materials to a government agency, which they obtained through no unlawful or improper action").  Judge Moss denied the government's motion without prejudice, explaining that he would need "far more" in order to censor a journalist by ordering destruction of inadvertently produced records, but the State Department does not

appear to have pursued the matter further.  *See* Docket, *100Reporters v. U.S. Dep't of State*, No. 1:19-cv-01753-RDM (D.D.C.).

Judge Moss is not alone.  Rather, as another judge of this Court recently explained, a finding that certain information *could have qualified* for an exemption "does not end the matter." *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *31.  That opinion (at *47) cited with approval *Sierra Club v. EPA*, 505 F. Supp. 3d 982 (N.D. Cal. 2020), which similarly observed that there is no "compelling rationale for holding that a court should wield its inherent authority to compel the return or destruction of documents produced under FOIA any time the producing agency *could have invoked* a statutory exemption but inadvertently failed to do so."  *Id.* at 991 (emphasis added). In other words, Defendant is not entitled to a 'get-out-of-jail-free' card from this Court simply because it *could have* applied various FOIA redactions that it, in fact, did not apply.

Defendant's Motion does not substantively address these judges' conclusions.  Likewise, Defendant's Reply Brief (ECF #29) provided no rebuttal on this point.  Short of its naked assertion that this Court should reach the opposite conclusion, Defendant has offered no compelling rationale (indeed, no rationale at all) as to why this Court should reject the conclusions of other judges on this Court.  Moreover, this Court's seeming conclusion that the existing protective order "is to remain in place unless" Defendant's allegedly planned redactions are found inappropriate (ECF #31) is erroneous, transforming what is supposed to be an "extraordinary ask" into a routine request, whereby the government is guaranteed clawback "as a matter of course" (*Cowan*, 2022 U.S. Dist. LEXIS 166363, at *46) unless its redactions were improper (and thus clawback is irrelevant because FOIA *requires* disclosure).

**IV.    "Clawback" Cases Have Identified Factors for the Court to Consider, Which Weigh in Plaintiffs' Favor Here.**

A review of the relatively few reported FOIA clawback cases "illustrate[s] several significant considerations" that guide courts' analyses. *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *44. These cases make clear that Defendant is not entitled to a protective order simply because unredacted material may fall within a FOIA exemption. Instead, to be entitled to such extraordinary relief, the unredacted material must serve "no discernible public interest" and be "reasonably … expected to harm" an interest that FOIA exemptions seek to protect. *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16; *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *45; *see, e.g.*, *ACLU v. DOD*, 2012 U.S. Dist. LEXIS 194264 (S.D.N.Y. Mar. 20, 2012) (permanent clawback order appropriate for an inadvertently disclosed classified military document that could harm national security); *Sierra Club*, 505 F. Supp. 3d at 991 (declining to compel destruction of inadvertently disclosed names and email addresses of petroleum lobbyists because "EPA has identified no serious and non-speculative harm likely to result"); *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16-17 (emphasis added) (order not to disclose, disseminate, or make use of inadvertently disclosed names of people who had brought claims against the Park Police appropriate because "there [wa]s no discernible public interest in having the names of private citizens disclosed" in that case). Courts also examine whether the agency discovered its own error or instead was notified by the requester (*ACLU*, 2012 U.S. Dist. LEXIS 194264, at *4; *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *11; *100Reporters*, 602 F. Supp. 3d at 83; *cf.* MPO at 2 ("Counsel's email alerted ATF to the inadvertent production")), and the extent and scope of the agency's negligence (*Memphis Publ'g Co. v. FBI*, 189 F. Supp. 3d 28, 30 (D.D.C. 2012)).

At bottom, courts recognize that an order commanding sequestration or destruction of records should not be granted reflexively, merely because the government asks, and that any

exercise of such "extraordinary" judicial power must be "'a reasonable response to the problems and needs that provoke it.'"  *Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815, at *16 (citing *Degen*, 517 U.S. at 823-24).  These factors weigh in Plaintiffs' favor here.  Although this Court previously explained that "it is not apparent from plaintiffs' cited cases that this standard should apply to *temporary* protective orders" (ECF #30 at 3), the present procedural posture (the government's request for a *permanent* protective order) now requires consideration of these factors.

### A.  ATF's Covert Surveillance of Lawful Firearm Purchasers Is a Matter of Great Public Concern that Has Sparked Not Only Keen Media Interest, but Also Attention from Congress.

Congress created NICS as a means for licensed dealers to verify quickly whether a prospective firearm purchaser is eligible to receive a firearm under federal and state law.  *See* 18 U.S.C. § 922(t)(2).  But it recently has been revealed that ATF and the FBI have been abusing that verification process to surveil Americans *who are eligible* to purchase firearms.  *See* ECF #20-1 at ¶14 ("Monitoring records is designed for suspects under investigation by ATF that are not otherwise prohibited.").  In April of 2021, journalist John Crump reported that leaked ATF documents revealed the agency's involvement in a covert, warrantless surveillance program of an untold number of law-abiding firearm purchasers, through daily monitoring[11] of all firearm transactions that are processed through the NICS system.[12]

---

[11] This involves a daily check of the NICS Audit Log, because federal law requires information on approved transactions to be deleted within 24 hours.

[12] John Crump, *Leaked Document Shows ATF Spying on Gun Buyers Through NICS ~ VIDEO*, AmmoLand (Apr. 26, 2021), https://tinyurl.com/3fjvxckr.

The targets of this surveillance program are those merely suspected of having committed or being engaged in various crimes;[13] they do not receive notice that their transactions are being or have been monitored, and there is no mechanism to appeal such surveillance – which can continue indefinitely, ungoverned by any law or regulation and unmonitored by any court.[14] Under this surveillance scheme, virtually anyone can request surveillance – ATF records evidence requests not only from federal law enforcement agents (*e.g.,* ATF and FBI), but also from state and local officials who participate in various task forces, and requests made even by *regulatory* personnel within ATF who are not authorized to engage in law enforcement.[15] *See* ECF #20-1 ("agents and personnel").

Finally, although the FBI asks that requesters supply a reason to surveil a target, there is neither a minimum standard (*e.g.*, probable cause, reasonable suspicion, etc.) required, nor a procedure to review such justifications. Thus, examples of tenuous justifications abound. Even unverified anonymous tips suffice, suggesting the program is ripe for abuse with zero oversight whatsoever.[16] In one case, ATF requested NICS monitoring of a man who purchased a shotgun shortly after news of the highly publicized Derek Chauvin verdict was released. Strikingly, "[t]he agent did not even claim … that his suspect could be a straw purchaser. He just said [the suspect]

---

[13] John Crump, *ATF & FBI Monitor Over 1,000 Law-Abiding Gun Owners*, <u>AmmoLand</u> (Oct. 22, 2021), <u>https://tinyurl.com/y77fpzt7</u>.

[14] Emily Miller, *EXCLUSIVE: Documents Show FBI and ATF Warrantless Surveillance Through Gun Background Checks*, <u>Epoch Times</u>, <u>https://tinyurl.com/ycxf8a62</u> (Jan. 17, 2023).

[15] *See* ATF Industry Operations Manual at 1 (Oct. 2019), <u>https://tinyurl.com/mpn52pjt</u> (making clear that Industry Operations Investigators are regulatory personnel only and that they should report criminal violations to the appropriate authorities).

[16] Miller, *supra* note 14; Emily Miller, *EXCLUSIVE: ATF Gains Financial Information on Potential Gun Buyers for Warrantless Tracking, Documents Show*, <u>Epoch Times</u>, <u>https://tinyurl.com/yebs5m7z</u> (Mar. 23, 2023).

*may* use a gun for rioting."[17]   Other requests arguably are even more troubling.  For example, ATF

sought daily surveillance of numerous individuals because, in the agency's opinion after obtaining

the persons' financial records,[18] they were deemed *too poor* to be purchasing firearms for lawful

purposes.[19]   Even seeming firearm hobbyists have been tracked without their knowledge.  In one

such case, FBI monitored a man "for at least six months" on the grounds that "he had a 'habit' of

purchasing new guns, tinkering with them, losing interest, and subsequently selling them" at a loss

– all perfectly lawful conduct.[20]   In other words, the ATF and FBI's own records produced in this

case undermine the FBI's claim that "[s]uspects are monitored when they misuse the NICS system

– generally by providing false information on the ATF From [sic] 4473 and/or attempting to straw

purchase."  ECF #32-4 ¶10.  The examples above have nothing to do with "misuse" of NICS.

     As of 2021, Defendant[21] and its FBI[22] counterparts were actively monitoring the NICS

transactions of "over 1,000 American citizens," all the while collecting not only their personal

information but also detailed and real-time information about their exercise of constitutional

rights.[23]

        The documents now in question were produced by ATF in response to the request described

above – but that is the entirety of what counsel is permitted to say about the disputed records.  This

---

[17] Miller, *supra* note 14 (emphasis added). The man had commented about wanting to "get the shotgun tonight," which was apparently suspicious. *Id.* With no judicial determination of probable cause or even a legal standard to apply, an expression of one's anticipation of riots and the present desire to defend oneself apparently justified future, warrantless, open-ended transaction monitoring.

[18] Emily Miller, *EXCLUSIVE: Texas Coordinates with ATF to Share Income of Residents for Warrantless Monitoring*, Epoch Times, https://tinyurl.com/4fath9wy (Apr. 18, 2023).

[19] *See id.*; *see also* Miller, *supra* note 14.

[20] Emily Miller, *EXCLUSIVE: FBI Carried Out Warrantless Monitoring on Man Who Posted Guns for Sale on Facebook*, Epoch Times, https://tinyurl.com/yv6mm39c (July 25, 2023).

[21] https://tinyurl.com/ymr7wprx.

[22] https://tinyurl.com/4mm72svw.

[23] Crump, *supra* note 13.

Court's orders prevent Plaintiffs from saying anything more about those records – including whether there is a public interest in disclosure of various portions of the redacted records. Nevertheless, based on the coverage and inquiries about ATF's prior disclosures in this series, it is evident that there has been and continues to be a significant public interest in information related to the FBI and ATF's warrantless NICS Monitoring Program.  The articles cited above are just some of the examples of the broad media coverage this story has inspired.[24]  In addition, Members of Congress have taken interest in the story and called for reform.  *See* ECF #28-1, Declaration of Aidan Johnston at ¶¶9-10.  So too for state legislators.[25]  At least one piece of legislation has been shelved, in part, due to the negative attention brought by this story.  ECF #28-1 at ¶9.  *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 58 (D.D.C. 2008) ("Given the extent to which plaintiff's allegations have been found to be credible by the Senate Report, and the strong public interest in ferreting out possible improprieties at the SEC, disclosure is clearly warranted...").  Thus, even though barred from discussing the public's interest in the documents in question, it is clear the public interest weighs in Plaintiffs' favor here.  Defendant's Reply (ECF #29 at 3) responds that Plaintiffs' discussion of "public interest in the records generally does not necessarily translate to public interest in certain specific information contained in those records," apparently forgetting that

---

[24] *See, e.g.*, Guns & Gadgets 2nd Amendment News, *SHOCKER!!! FBI & ATF Caught SECRETLY Monitoring Gun Owners!!*, YouTube (Jan. 15, 2023), https://youtu.be/crVB8GRHlGU; God Family and Guns, *ATF Is Monitoring Your Gun Purchases : This Leaked Document Is Proof!!*, YouTube (Apr. 28, 2021), https://youtu.be/qlXCFooQVWo; Ben Whedon, *FBI, ATF Use Gun Background Checks to Track Specific Purchasers, Documents Show*, Just the News, https://tinyurl.com/mtuw3mtn (Jan. 13, 2023); P. Gardner Goldsmith, *Docs Reveal FBI, ATF Have Been Monitoring Law-Abiding Gun Buyers Through Federal Background Checks*, mrcTV (Jan. 17, 2023), https://tinyurl.com/yckzptp8; Dan Zimmerman, *FBI Monitoring Gun Owners Who Sell Firearms via Facebook*, Truth About Guns (July 23, 2023), https://tinyurl.com/mr4ay2mt.
[25] Miller, *supra* note 18.

Plaintiffs are forbidden from discussing the "specific" public interest in the redacted portions of records because of Defendant's request to have them gagged.

**B. The Public Has a Significant Interest in Learning About the NICS Monitoring Program, Which Violates Statutory Prohibitions and Constitutional Rights.**

The Brady Handgun Violence Prevention Act of 1993 established the NICS System. Pub L. No. 103-159, 107 Stat. 1536. Pursuant to the Brady Act, the FBI is permitted to gather various kinds of information about prospective gun purchasers to check that information against records contained in various federal databases, to determine whether the prospective transferee is eligible to possess the firearm. *See* 28 C.F.R. § 25.9(a). However, aware of the potential for abuse when the government is handed information in real-time about firearm transfers (the exercise of an enumerated constitutional right), Congress explicitly prohibited the federal government from "establish[ing] … any system of registration of firearms, firearms owners, or firearms transactions or dispositions...." 18 U.S.C. § 926(a). Likewise, Section 103(i) of the Brady Act, now codified at 34 U.S.C. § 40901, prohibits the government from "us[ing] [NICS] to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons, prohibited by section 922(g) or (n) of title 18 or State law, from receiving a firearm." In order to give further teeth to those restrictions, starting in 2004 (and made permanent in 2012), Congress included annual appropriations provisions requiring the FBI to destroy all NICS records of "approved" firearm transactions within 24 hours. Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3, 95; 28 C.F.R. § 25.9(b)(1)(iii).

In 1998, contemporaneously with the effective date of the Brady Act, the FBI enacted a regulation promising that "the FBI will not establish a federal firearms registry. The FBI is expressly barred from doing so...." 63 *Fed. Reg.* 58303 (Oct. 30, 1998). The FBI assured that it would use the newly created NICS Audit Log (a record of all firearm transactions that are run

through the system) "solely for the purpose of satisfying the statutory requirement of ensuring the privacy and security of the NICS and the proper operation of the system." *Id.* Directly responding to "concern that the Audit Log would allow [states] and law enforcement agencies access to records of approved transfers," the FBI promised that this was a non-issue, as "such information is available only to the FBI and only for the purposes of conducting audits...." *Id.* at 58304.

But the FBI's promise did not last long. Only one month later, another FBI rulemaking adopted a regulation to permit that very same "disclosure" of Audit Log records to "law enforcement agencies … [i]f, during the course of any activity or operation of the system authorized by regulations … any record is found by the system which indicates" a violation of law. 63 *Fed. Reg.* 65227 (Nov. 25, 1998). In 2004, the FBI further watered down that regulatory language, the current form of which now provides that "[i]nformation in the NICS Audit Log, including information not yet destroyed … that indicates … a violation or potential violation of law or regulation, may be shared with appropriate authorities responsible for investigating, prosecuting, and/or enforcing such law or regulation." 28 C.F.R. § 25.9(b)(2)(ii). The NICS Monitoring Program is purportedly justified based on that regulation. *See* ECF #20-1 ¶14.

As further detailed below, the NICS Monitoring Program: (i) conflicts with the statutory text; (ii) operates without warrant and often without any reasonable or particularized suspicion; (iii) permits requests for monitoring from, and shares information with, non-law enforcement personnel; (iv) violates the Second and Fourth Amendments; (v) defies congressional intent; and (vi) has caused Members of Congress serious concerns, irrespective of constitutionality or legality. For each of these reasons, the American public has an overriding interest in learning more about the NICS Monitoring Program – the subject of Plaintiffs' FOIA request.

First, the program conflicts with 18 U.S.C. § 922(t)(2)(C), which flatly requires destruction of "all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer." When ATF (and other) personnel request warrantless NICS surveillance of individuals, FBI's copying, retention, and forwarding of such records necessarily preserves a record "relating to" a NICS-based transaction, contrary to the statute's unyielding imperative that such a record be "destroy[ed]," and in violation of the congressional and regulatory imperative that such destruction take place "within 24 hours after the FFL receives communication of the determination that the transfer may proceed." 18 U.S.C. § 922(t)(2)(C); 28 C.F.R. § 25.9(b)(1)(iii); 118 Stat. 3, 95. Defendant's claim that the FBI's *regulation* permits such unlawful retention does not cure this *statutory* violation.

Second, the program utilizes warrantless and sometimes even suspicionless surveillance to accumulate firearm purchase records from people *who are not prohibited* from possessing firearms. *See supra* notes 12-20 (reporting on various instances of surveilling innocuous and lawful behavior). The NICS Monitoring Program enables unaccountable agency monitoring, in real time, of the time and place of a target's Second Amendment activity, which is analogous to the information gathered via pen registers and "trap and trace" devices for phone calls. *See* 18 U.S.C. § 3127(3), (4) (providing that the call information gleaned shall "not include the contents of any communication").[26] The Monitoring Program also provides information about the firearms

---

[26] In the case of pen registers and "trap and trace" devices, Congress recognized the risk of abuse and accordingly made federal law *require* "[c]ourt approval … to obtain" such surveilled information. C.J. Williams & Sean R. Berry, Federal Criminal Practice 31 (2d ed. 2021) (emphasis added); *see* 18 U.S.C. § 3122. In stark contrast, the NICS Monitoring Program requires no court approval – nor could it, as it lacks any statutory basis. Here, Congress did not even permit court approval to allow retention of NICS Audit Log records, instead requiring their destruction *without exception*.

themselves, linking make, model, and serial number to a person's name, address, and other identifying information – analogous to the government monitoring, in real time, what books a person borrows from the library, or what websites he visits.[27]

Third, the program has allowed access to NICS information by all sorts of government persons – a "requestor can be a 'Special Agent, Industry Operations Investigator (IOI), Intelligence Research Specialist, Intelligence Analyst, etc.'"[28] Yet such personnel are not law enforcement persons, do not investigate or prosecute criminal violations of federal law, and certainly have no business monitoring and retaining records of Americans' gun purchases.

Fourth, the program violates the Second and Fourth Amendments. When the Second Amendment's plain text "covers" an individual's conduct (in this case, the acquisition of arms, a threshold step to "keep[ing]" arms by persons that the government concedes are eligible to possess them), such conduct is presumptively protected, and governmental regulations affecting that conduct[29] must find support in widespread Founding-era tradition. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). As no such tradition of government monitoring exists, Defendant's program violates the right to keep and bear arms. Further, the "basic purpose of [the Fourth] Amendment[] … is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967). Just as "individuals have a reasonable expectation of privacy in the whole of their physical

---

[27] *See, e.g.*, *Riley v. California*, 573 U.S. 373, 395, 396 (2014) (requiring a warrant to search a cell phone's contents and noting that "[a]n Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns" and "[d]ata on a cell phone can also reveal where a person has been").

[28] Crump, *supra* note 12.

[29] Indeed, public awareness of the fact that the government is surveilling unknown targets' firearm purchases can and will discourage even law-abiding people from purchasing firearms for fear of appearing "on a government list."

movements" and "society[] expect[s] … that law enforcement agents and others would not – and indeed, in the main, simply could not – secretly monitor and catalogue every single movement of an individual's car for a very long period," so too is there a reasonable expectation of privacy from daily surveillance in one's personal firearm transactions and a societal expectation that law enforcement does not "secretly monitor and catalogue every single" such transaction. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). After all, the public should be able to reasonably *expect* that the government does exactly what the law says – that it destroys "all records of the system relating to the person or the transfer" within "24 hours." 18 U.S.C. § 922(t)(2)(C); 28 C.F.R. § 25.9(b)(1)(iii). If the government does not, such a program is unreasonable, unwarranted, and offensive to the Fourth Amendment.

Fifth, the program operates contrary to Congress's expressly stated plan for the NICS system, which was that the federal government would be barred from keeping or using records related to Americans' firearms purchases beyond the initial check. It is deeply ironic that the present dispute involves the government's effort to prohibit the use to inform the public about records of a secret government program that uses and refuses to destroy records about gun sales in defiance of law.

Sixth, aside from the constitutionality or legality of the NICS Monitoring Program, state and federal legislators are concerned about Defendant's overreach (as explained above). It is not a stretch to believe that such legislators may seek to use legislative means to rectify the FBI and ATF's abuse of the NICS system.

Ultimately, the Court's view of Plaintiffs' arguments regarding ATF abuses surrounding the NICS Monitoring Program does not resolve the issue. What matters is the fact that there are

serious arguments that the program is both unconstitutional and unlawful.[30]  It is clearly in the public interest to learn more about this government surveillance program occurring behind closed doors.

In its prior briefing, Defendant entirely sidestepped Plaintiffs' arguments about the legality of the NICS Monitoring Program, arguing that "they are irrelevant to … whether the Court should issue a protective order...."  ECF #29 at 5 and n.2.  On the contrary, the legality of the subject matter of a FOIA request is unavoidably relevant and material to the question of whether an agency has a legitimate interest in withholding certain information, and the question of whether the public has an interest in learning more about the government's activities.  *See, e.g.*, *Rimmer v. Holder*, 700 F.3d 246, 258 (6th Cir. 2012) ("FOIA is concerned … with shedding light on misconduct of the federal government").

### C. Defendant Has Failed to Show that Plaintiffs' Possession or Even Limited Use of Certain Redacted Records Will Lead to Harm.

As to the reasonable expectation of harm factor, *Cowan* is instructive, as it explicitly noted that even satisfaction of a FOIA exemption's criteria "does not end the matter" because FOIA, as a general matter, prohibits the government from withholding even properly exempt materials "unless it also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA exemption."  2022 U.S. Dist. LEXIS 166363, at *31.  The court then "request[ed] that the parties supplement the record to demonstrate the harm that will result from the public disclosure of the withheld materials."  *Id.* at *47.  As that court explained, such harm cannot be "'nebulous,' 'speculative or abstract,' 'generalized,' 'boilerplate,' or 'conclusory.'"  *Id.* at *31-32.  Rather,

---

[30] Again, the Court's minute orders prevent Plaintiffs (and their counsel) from discussing (even generally) the legality or constitutionality of any portion of the redacted records.

"'[w]hat is needed is a focused and concrete demonstration' that links *particular* material withheld with *particular* harms foreseen." *Id.* at *32 (emphasis added).

Yet after omitting any such analysis of harm in prior filings,[31] Defendant relegates its discussion of foreseeable harms to just two pages of its motion and, even then, still does not offer any specifics, instead claiming generally that "[i]n certain contexts, the foreseeable harm analysis cannot be a basis for disclosure," that "[i]n some cases … '"the very context and purpose of" the withheld material'" demonstrates harm, and that, in certain contexts, merely asserting certain exemptions "'goes a long way to show the risk of foreseeable harm'…." MSJ at 14-15. But these statements are the exact sort of "'nebulous,' 'speculative or abstract,' 'generalized,' 'boilerplate,' or 'conclusory'" allegations that do not suffice, failing to discuss "particular" information and directly link it to "particular harms." *Cowan* at *32. Defendant's brief offers virtually no *substantive* argument about *this* case, instead obliquely referencing "the Second Barnett Declaration,"[32] which ATF claims shows that "there are foreseeable harms associated with a disclosure of law enforcement techniques and sources that were used as part of [] ATF criminal investigations…." *Id.* at 15.

This Court's orders prevent Plaintiffs from arguing whether there is any legitimate use(s) for any discrete part(s) of the redacted records at issue, or countering ATF's naked assertions as to whether any such use(s) might lead to some sort of harm. Nevertheless, Plaintiffs have continually expressed their desire to narrow the scope of what is in dispute (ECF #25 at 2). Although this Court's minute orders prevent Plaintiffs from discussing even the sorts of redacted records at issue,

---

[31] Defendant's Motion for Protective Order completely omitted any discussion of this factor that is necessary to the Court's analysis. ECF #28 at 17.

[32] ATF appears to rely on the Seidel Declaration in its Statement of Material Facts (ECF #32-1, ¶ 23), but in its brief, ATF's allegations of foreseeable harm do not reference, and thus apparently do not rely on, the Seidel Declaration, ECF #32-4.

ATF – which is not barred from discussing the documents – already has disclosed various categories of information it claims are contained in the redacted records. *See, e.g.*, ECF #20-1 at ¶28 (emphasis added) ("*the information ... reveals*").

For example, ATF reports that the redactions contain "personally identifying information of the subjects of its investigation, including **birth dates** and **social security numbers**." ECF #20 at 4 (emphasis added). To the extent that is true, neither Plaintiffs nor counsel have any interest in birth dates and social security numbers, and would agree to destroy any such records.

Likewise, ATF reports that "each email includes the **names**, **email addresses**, and sometimes **telephone numbers** for multiple ATF and FBI agents and staff." ECF #20-1 at ¶15; ECF #32-3 at ¶27; ECF #32-4 at ¶14. To the extent that is true, neither Plaintiffs nor counsel have any interest in the names, email addresses, or telephone numbers of government personnel, and would voluntarily agree to destroy any such records and, quite frankly, agreed to that prior to Defendant necessitating additional briefing. Consequently, any professed harms of "violent rhetoric targeting ATF personnel," "[p]ublicity ... prejudic[ing] their effectiveness," "unnecessary, unofficial questioning," "hostility," "inflict[ion] [of] violence," "professional staff ... becom[ing] targets of harassing inquiries," or "attacks on FBI communications through 'spoofing'" are wholly irrelevant. ECF # 32-3 at ¶28; ECF #32-4 at ¶¶15, 16, 24.

Nor do Plaintiffs or counsel have any interest in the identity of "citizens who provided information to the Government in support of a criminal investigation ... **witnesses or confidential sources**...." ECF #20-1 at ¶¶15, 25; ECF #32-3 at ¶25. The same for "various law enforcement **file numbers and codes**." ECF #20-1 at ¶28; ECF #32-4 at ¶17. Thus, any professed harms of "cooperating sources ... be[ing] subject to retaliation" are not foreseeable here. ECF #32-3 at ¶25.

Finally, ATF's Second Declaration (ECF #32-3) now adds significantly greater allegations about so-called "trace data," or "records of specific firearm traces," and alleges all sorts of harm including "compromis[ing] [] ATF investigations…." *Cf.* ECF #20-1 ¶¶ 17-20 with ECF #32-3 ¶¶ 17-22. But ATF provides only general descriptions ("information … records of specific firearms traces" and "might include information from the FTS database," and "additional, valuable information"). ECF #32-3 ¶¶ 19, 21; *Cf. Cowan* at *32. ATF does not discuss specifically what sorts of information "trace data" includes, and this Court's orders prohibit Plaintiffs from discussing the matter further, or discussing what sorts of information they would be willing to destroy. Thus, this Court lacks any basis to conclude that ATF investigations will be compromised without any knowledge about the "particular" sort(s) of information at issue.

Plaintiffs submit that destruction of any such portions of these various types of information in disclosed records would alleviate the harms that Defendant's declarations allege could occur. This Court should not conclude that any harm is likely to occur from Plaintiffs' possession of any *other* categories or portions of the redacted records Defendant claims exist, without knowing what those redactions might be, what they might show, and how they might reasonably be used. However, at present, this Court's order effectively prohibits destruction of some *portions* of records without destruction of *all* of the records. Defendant seeks to capitalize on that Hobson's choice, maligning Plaintiffs for "agree[ing] that 'there is no public interest in dissemination' for at least some of the information … yet nonetheless oppos[ing] the protective order." ECF #29 at 4. But that is a *non sequitur*, as the protective order that Defendant sought applies to *all* the categories of information, not just the "*some*" for which Plaintiffs' agree "there is no public interest in dissemination." Contrary to the picture Defendant attempts to paint for this Court, this is not an all-or-nothing issue.

For example, ATF and FBI also claim that Defendant has disclosed to Plaintiffs "identifying information of third parties who were of investigative interest to the FBI and/or the ATF" – in other words, targets of Defendant's warrantless surveillance program.  ECF #32-4 ¶17; ECF #32-3 ¶ 29.  Defendant relies on the D.C. Circuit's conclusion that there is no public interest in "'releas[ing] *to the public* that another individual was the subject of a law enforcement investigation,'" MSJ at 8 (citation omitted).  The ATF and FBI offer a litany of speculative "harms" resulting from "strong negative connotation[s]," "stigma[s]," "harassment or embarrassment," "undue public attention," "professional and social repercussions," or "physical harm or threats of harm or death" if the public learned the identity of those whose rights Defendant has violated through NICS Monitoring.  ECF #32-4 at ¶¶ 17, 19; see also ECF #32-3 ¶ 29.

But Defendant apparently overlooks – for example – the possibility of disclosing this information *to the persons* who were the subjects of ATF/FBI investigations.[33]  It is entirely unclear what "privacy interest" a person has against finding out that he or she was surveilled by the government pursuant to an unlawful and unconstitutional covert monitoring scheme.[34]  Rather, if it "is well-recognized that individuals have substantial privacy interests in relation to being associated with law enforcement investigations" as Defendant's FBI Declarant claims, *id.*, Defendant surely would not dispute individuals' "substantial privacy interests" in *being free from* warrantless, unlawful, and unconstitutional surveillance programs to begin with.  *See* U.S. Const.

---

[33] Similarly, productions 1-12 in this case reveal that ATF and FBI have targeted and surveilled a disproportionate number of black women as part of the NICS Monitoring program.  Certainly, any other documents demonstrating targeting of particular groups would be of great interest to the public, and to Congress.

[34] Moreover, to the extent that any of these surveilled persons is a *member* of Plaintiff GOA, a protective order would limit Plaintiffs' associational freedom to work with their own members, who join GOA, *inter alia*, so that GOA can ferret out illicit government activity, to protect their rights.

amend. IV; *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (an agency may not rely on "'fear of embarrassment' to withhold information.").[35]

Finally, Defendant can hardly complain about the harm will be caused to it under Exemption 7(E) based on the disclosure of "techniques," "procedures," and "guidelines" regarding "law enforcement investigations or prosecutions" (MSJ at 12), if those "techniques and procedures" (the NICS Monitoring Program) are unlawful and unconstitutional (as Plaintiffs have briefed above). For example, if law enforcement was frisking everyone walking down a public street, the government could hardly claim it a 7(E) Exemption on the theory that the police had a law enforcement interest in keeping people from using different streets and thereby avoiding the unconstitutional "techniques and procedures." In other words, whereas Exemption 7(E) is designed to prevent *disclosure* that will "risk [of] circumvention of the law," in this case *withholding* carries the exact same risk – that the ATF and FBI will be permitted to continue to "circumvent[] the law" without the knowledge of the public. *See, e.g.*, *Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 64 (D.D.C. 2014) ("under the crime-fraud exception, communications between a lawyer and client 'are not privileged if they "are made in furtherance of a crime, fraud, or other misconduct."'").

---

[35] Defendant's FBI Declarant undertakes to circumscribe just what the "public interest" may be. According to Defendant, "a public interest [in disclosure] exists *only when* information about an individual, their name, or their identifying information would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights." ECF #32-4 at ¶13 (emphasis added). Predictably, this FBI Declarant wholly ignores that the public also has a significant interest in disclosure of records which evidence abuses of government power. *See, e.g.*, *Rimmer*, 700 F.3d at 258 ("the public has an interest in unearthing agency misconduct" (citing *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989))). Such an interest more than countervails the entirely speculative harms Defendant proffered.

In short, most of Defendant's claims of harm pertain to categories of information that Plaintiffs do not seek to retain or use in any way. As for the information that remains, Defendant has utterly failed to show how it is even remotely foreseeable that Plaintiffs' possession (or use) of the records released in response to a request about an illegal government program will lead to harm. Quite to the contrary, Plaintiffs have demonstrated that allowing Defendant to cover up its misdeeds will lead to public harm, and thus there is no justifiable basis on which to conclude that there is "no discernible public interest" (*Hum. Rts. Def. Ctr.*, 2023 U.S. Dist. LEXIS 151815 at *16) in certain portions of the redacted information.

## V. The Government's Request that the Court Order Sequestration of Inadvertently Disclosed, Newsworthy Documents Invites an Unconstitutional Prior Restraint.

As this Circuit explains, "sunlight is said to be the best of disinfectants." *Jud. Watch, Inc. v. U.S. Dep't of State*, 344 F. Supp. 3d 77, 78 (D.D.C. 2018) (quoting Justice Brandeis). While Defendant may prefer that various details of its covert monitoring activities never see the light of day, its Motion for Protective Order seeks relief that conflicts with core First Amendment rights. Even in the best of scenarios, an agency's request that a court order a FOIA requester be prohibited from using documents within its possession is an "'extraordinary' ask that should not be granted as a matter of course." *Cowan*, 2022 U.S. Dist. LEXIS 166363, at *46. Such a request becomes even more suspicious when the government asks a court to command a nonprofit, public-interest organization, that has repeatedly engaged in quintessential press activity with regard to the very matter at issue, to permanently sequester and not use deliberately disclosed government records of a warrantless surveillance program. The government's ask here thus represents a request for a classic prior restraint that is subject to the strongest presumption of invalidity. *See N.Y. Times Co.*

*v. United States*, 403 U.S. 713, 714 (1971); *see also Times-Picayune Publ'g Corp. v. Schulingkamp*, 419 U.S. 1301, 1307 (1974).[36]

To be sure, the Supreme Court has recognized a few clearly delineated and carefully circumscribed exceptions to the First Amendment's flat ban on prior restraints, such as courts' "special solicitude for preserving fairness in a criminal trial," *Times-Picayune*, 419 U.S. at 1307, sealed documents that are considered "judicial records,"[37] or presentencing reports prepared for judges in criminal cases. *See, e.g.*, *United States v. Smith*, 123 F.3d 140, 152 (3d Cir. 1997) (collecting cases). But none of those scenarios is even arguably implicated here. Nor does this case involve FOIA documents "inadvertently included with the material supporting defendants' joint motion to dismiss" filed with a court. *Astley v. Lawson*, 1991 U.S. Dist. LEXIS 21611, at *27 (D.D.C. Jan. 11, 1991). Nor can Defendant rely on authorities discussing protective orders relating to civil discovery, where "[a] litigant has no First Amendment right of access to information made available *only for purposes of trying his suit*." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (emphasis added).

---

[36] Prior restraints are among the most heavy-handed restrictions on expressive rights, in that they prevent speech from ever occurring. *See Bd. of Trs. of Leland Stanford Junior Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) (noting that "a prior restraint on speech … allows the government to suppress the dissemination of information in advance of publication"). Accordingly, "[p]rior restraints are permitted 'only in exceptional cases,'" *id.* (quoting *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931)), because generally, "[e]ven a restraint of speech for a limited period is inconsistent with the First Amendment." *Id.* n.7; *see also Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers) ("It is clear that even a short-lived 'gag' order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect."); *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) ("Where … a direct prior restraint is imposed upon the reporting of news by the media, each passing day may constitute a separate and cognizable infringement of the First Amendment.").

[37] *Pub. Citizen Health Rsch. Grp.*, 953 F. Supp. at 405; *see also Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105 (1979) (distinguishing "unlawful press access to confidential judicial proceedings").

None of these exceptions applies when a government party deliberately, yet allegedly inadvertently, produces FOIA material to a requester outside of a court's docket or discovery procedures. Indeed, the D.C. Circuit has recognized that *Seattle Times* "emphasized that a 'party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes,' and upheld the order at issue in that case in part because it did 'not restrict the dissemination of the information if gained from other sources.'" *In re Rafferty*, 864 F.2d 151, 155 (D.C. Cir. 1988) (citation omitted); *see also P&G v. Bankers Tr. Co.*, 78 F.3d 219, 225 (6th Cir. 1996) (finding that *Seattle Times* "does not govern the situation where an independent news agency, having gained access to sealed documents, decides to publish them").

Here, Plaintiffs did not "gain[] the information … only by virtue of the trial court's discovery processes" or any other "court[] … process[]." *Rafferty*, 864 F.2d at 155. Nor did Plaintiffs employ any deception, ploy, trickery, or other scheme to obtain the unredacted records. Rather, Plaintiffs (entirely unbeknownst to them) were handed unredacted materials by Defendant itself, pursuant to Defendant's statutory FOIA obligations that exist separate and apart from this case. Defendant objects, arguing that "Plaintiffs invoked this Court's jurisdiction … and they 'may not now claim the Court lacks the authority to supervise the very process that they themselves set in motion.'" MSJ at 18 (citation omitted). But again, it is ultimately FOIA, not this Court, that compels Defendants to produce certain records to Plaintiffs, an obligation that exists with or without this Court's involvement. It would be a strange result indeed if different rules applied to inadvertent disclosures depending on whether a given FOIA request was presently the subject of litigation.

The only cases of which Plaintiffs are aware which have dealt with a First Amendment claim in an "inadvertent disclosure" FOIA case are *ACLU v. DOD*, 2012 U.S. Dist. LEXIS 194264, at *14 (S.D.N.Y. Mar. 20, 2012) (finding that "classified information remains classified notwithstanding 'any unauthorized disclosure,'" notwithstanding "that Plaintiffs acquired the Document innocently"), and *Pub. Citizen Health Rsch. Grp. v. FDA*, 953 F. Supp. 400, 404 (D.D.C. 1996) (finding First Amendment case law "distinguishable" because the case involved a third-party intervenor, and not "the party that disclosed the information [*i.e.*, the government agency] seeking to prevent its dissemination"). However, in deciding that case, Judge Urbina acknowledged that a permanent court order "prohibiting [a party] from disseminating or using the information contained in [an inadvertently released FOIA document]" might create "First Amendment concern[s]," being "'the kind of classic prior restraint that requires exacting First Amendment scrutiny.'" 953 F. Supp. at 404-05 (citing *Seattle Times*, 467 U.S. at 26).

As explained above, Plaintiffs' First Amendment argument should not be construed as a desire to publicize or use the social security numbers or birth dates of subjects of government monitoring, or the identities of confidential informants (*see* ECF #20-1 ¶25), information for which there is no public interest in dissemination. Nor do Plaintiffs have any desire to publicize or use contact information for government officials (*see id.* ¶15). However to the extent, as Defendant has alleged, the redacted records also "reveal[]" other information, such as "some discussion of the investigation," including "allegations of wrongdoing" and "specific law enforcement procedures and techniques" and "some discussion of [an] investigation" (*id.* ¶¶15, 25, 28) Plaintiffs certainly would use this information in the public interest to expose illegal government activity. However, this Court's orders prohibit Plaintiffs from "us[ing] [the] records or their contents for any purpose," to include even generally describing what sorts of information might be in the

records, whether any such government activities revealed might be unlawful or unconstitutional, whether the public has any interest in knowing about it, or whether any harm would occur. *See Multi AG Media LLC v. Dep't of Agric.*, 380 U.S. App. D.C. 1, 8 (2008) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)) (discussing FOIA's "basic purpose" as being "the citizens' right to be informed about what their government is up to"). Nevertheless, this Court certainly could infer from Defendant's persistence that various portions of the documents may be newsworthy. A court order "[p]rohibiting the publication of a news story or an editorial" is a prior restraint and violates the First Amendment, "the essence of censorship." *In re Providence Journal Co.*, 820 F.2d 1342, 1345 (1st Cir. 1986).

Previously, ATF responded with the *ipse dixit* that "[t]he issue is not one of Plaintiffs' speech...." ECF #29 at 5. In support, ATF relies only on the two cases that Plaintiffs identified – *ACLU* and *Public Citizen*. *Id.* at 4. But not only was *ACLU* arguably wrongly decided without any analysis (and thus entirely unpersuasive), it involved *classified information*, which Defendant has not alleged forms the basis for any exemption here. On the other hand, giving credence to Plaintiffs' claims here, in *Public Citizen* Judge Urbina agreed that serious First Amendment concerns would be raised by a court's issuance of a *permanent* protective order (*i.e.*, what ATF is now seeking from this Court). 953 F. Supp. at 404-05. ATF has offered this Court no reason to reject Judge Urbina's justified constitutional concerns, and instead to rely on a single out-of-circuit case which, in the context of "national security," dismissively brushed aside First Amendment concerns without any substantive analysis or citation to any authority.

In order to issue the *permanent* protective order that ATF now seeks, this Court must first conclude that there is a First Amendment-compliant basis on which to prohibit Plaintiffs (the media) from informing the public (printing the news) about the details of a surreptitious

government surveillance program (a matter of public interest).  Moreover, this Court must reach

that conclusion: (i) without having ever having examined the documents at issue; (ii) without

having any idea as to which portions of information Plaintiffs would intend to use; and (iii) without

having any knowledge as to the ways that Plaintiffs might use that information to further the public

interest.  In other words, Defendant asks this Court to impose a prior restraint on speech, without

knowing the content of the speech it is censoring, and to prohibit the client's attorneys from even

arguing as to why the client should not be restrained.  This Court should not oblige.

## VI.   This Court Should be Aware of How Its Decision Could Have Unintended Consequences.

Plaintiffs and their counsel in this case have acted responsibly with respect to the records

at issue at every stage.  First, Plaintiff's counsel promptly contacted counsel for Defendants and

"alerted ATF" to its unredacted production.  ECF #32 at 2.  Second, other than to review them

upon receipt (and discover ATF's error), Plaintiffs made no use of the records received.  Third,

Plaintiffs offered to make no use of the records pending a final judicial resolution of the issue.

Fourth, even to prepare responsive pleadings, the records were not reviewed again.

Under such circumstances, the Court should consider how any ruling for ATF might affect

the future behavior of litigants (and nonlitigants) in the case of subsequent careless or inadvertent

FOIA disclosures.  Should a permanent protective order be issued here, future **requesters** receiving

careless or inadvertent FOIA disclosures will undoubtedly be incentivized to rush those documents

into the public sphere, rather than contacting the producing agency and attempting to work out

differences in good faith.

If the Pentagon Papers could be published by the New York Times, it is difficult to consider

what remedies an agency would have if disclosed documents were disseminated.  Moreover,

should a categorical duty be imposed on recipients of negligently produced records to return them,

32

**government agencies** would be set free to negligently, recklessly – or even *intentionally*, as a form of entrapment – produce whatever they want to FOIA requesters, knowing that they are automatically entitled a "mulligan" in the form of a guaranteed clawback to correct their alleged mistakes.

## CONCLUSION

It is a sad and ironic twist that the ATF professes its desire to protect the **privacy** of gun owners, considering this case involves ATF's covert **surveillance** program that for years has been spying on, invading the privacy of, and gathering private information about those very persons. It is more ironic still that ATF seeks to protect that information vis-à-vis Plaintiffs, nonprofit organizations whose mission is to protect and defend the rights (including the privacy) of gun owners against government infringement. This Court should deny Defendant's request to force Plaintiffs to sequester and not use for any purpose records about a secret government program that fails to sequester, nefariously uses, and fails to destroy records about gun sales that Congress's own *statutory protective order* declares must be destroyed and not used.

This Court should decline Defendant's request to order Plaintiffs to cover up information produced in response to a FOIA request seeking information about the federal government's unlawful and unconstitutional surveillance activities. The Court should deny Defendant's request for a permanent protective order.[38] Finally, due to the novel legal and constitutional questions

---

[38] Alternatively, to the extent the Court is inclined to grant Defendant's request, Plaintiffs renew their request to file briefing under seal or, alternatively, to have this Court consider the records at issue *in camera*. Courts routinely consider documents *in camera* while deciding issues in FOIA cases. *See* 5 U.S.C. § 552(a)(4)(B) (district courts "may examine the contents of such agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions...."); *Spirko v. United States Postal Serv.*, 147 F.3d 992, 996-97 (D.C. Cir. 1998) (citations and quotation omitted) ("this court has yet to identify particular circumstances under which *in camera* inspection would be *inappropriate*....").

presented in this case, Plaintiffs request oral argument on the limited issue of whether a permanent

protective order should issue.

Respectfully submitted,

December 20, 2023

*s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
DC District Court Bar# MS0009

George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@bergstromattorneys.com

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Stephen D. Stamboulieh, hereby certify that on the 20th of December 2023, I have caused the foregoing document or pleading to be filed with this Court's CM/ECF system which generated a notice and delivered the document to all counsel of record.

*By: Stephen D. Stamboulieh*
Stephen D. Stamboulieh